UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RAYMOND EUGENE LLOYD, JR.,

       Petitioner,

                                     CASE NO. 2:08-CV-14232

   v.                              CHIEF JUDGE GERALD E. ROSEN

                                     MAGISTRATE JUDGE PAUL J. KOMIVES

THOMAS K. BELL,

       Respondent.

_____/


## REPORT AND RECOMMENDATION

*Table of Contents*

| | | |
|---|---|---|
| I. | RECOMMENDATION | 2 |
| II. | REPORT | 2 |
| | A. *Procedural History* | 2 |
| | B. *Factual Background* | 6 |
| | C. *Procedural Default* | 13 |
| | D. *Standard of Review* | 15 |
| | E. *Ineffective Assistance of Counsel (Claim I)* | 17 |
| |    1. *Clearly Established Law* | 17 |
| |    2. *Analysis* | 19 |
| | F. *Time to Secure Mental Health Expert (Claim II)* | 26 |
| |    1. *Clearly Established Law* | 27 |
| |    2. *Analysis* | 28 |
| | G. *Jury Instructions (Claim III)* | 29 |
| |    1. *Clearly Established Law* | 29 |
| |    2. *Analysis* | 30 |
| | H. *Competence to Stand Trial (Claim IV)* | 34 |
| |    1. *Clearly Established Law* | 34 |
| |    2. *Analysis* | 35 |
| | I. *Recommendation Regarding Certificate of Appealability* | 40 |
| |    1. *Legal Standard* | 40 |
| |    2. *Analysis* | 42 |
| | G. *Conclusion* | 42 |
| III. | NOTICE TO PARTIES REGARDING OBJECTIONS | 43 |

I.      <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus.  If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

II.     <u>REPORT</u>:

A.      *Procedural History*

1.      Petitioner Raymond Eugene Lloyd, Jr., is a state prisoner, currently confined at the Gus Harrison Correctional Facility in Adrian, Michigan.

2.      On March 31, 1995, petitioner was convicted of first degree premeditated murder, MICH. COMP. LAWS § 750.316; and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the St. Clair County Circuit Court.  On April 24, 1995, he was sentenced to a term mandatory term of life imprisonment without parole on the murder conviction, and to a mandatory consecutive term of two years' imprisonment on the felony-firearm conviction.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.      MR. LLOYD WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO INVESTIGATE AND PRESENT THE SUBSTANTIAL DEFENSES OF INSANITY AND DIMINISHED CAPACITY.

II.     THE PROSECUTOR CREATED MANIFEST INJUSTICE WHEN HE URGED THE JURY TO REJECT THE DEFENSE EXPERT'S TESTIMONY.

III.    MANIFEST INJUSTICE AROSE WHEN THE TRIAL COURT FAILED TO GIVE THE JURY THE DEFINITION OF MENTAL ILLNESS AND DIMINISHED CAPACITY PRIOR TO EXPERT TESTIMONY ON THOSE TERMS AND COMPOUNDED THE INJUSTICE IN ITS CLOSING INSTRUCTIONS WHEN IT AGAIN FAILED TO DEFINE MENTAL ILLNESS AND FAILED TO REQUIRE THE JURY TO CONSIDER A

2

VERDICT OF GUILTY BUT MENTALLY ILL.

IV.    MR. LLOYD WAS DENIED DUE PROCESS WHEN HE WAS GIVEN ONLY ONE WEEK TO SECURE AN INDEPENDENT EVALUATION.

V.     MR. LLOYD WAS DENIED A FAIR TRIAL BECAUSE OF THE CUMULATIVE EFFECT OF THE ERRORS.

VI.    THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO ORDER A NUNC PRO TUNC COMPETENCY EVALUATION.

VII.   MR. LLOYD IS ENTITLED TO A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE.

The court of appeals reversed petitioner's conviction, concluding that counsel was ineffective for failing to present the defenses of diminished capacity and insanity. To provide guidance on retrial, the court of appeals also addressed petitioner's jury instruction claim, concluding that the trial court had erred in failing to define mental illness and diminished capacity for the jury prior to expert testimony on those issues and by failing to instruct the jury to consider a verdict of guilty but mentally ill. Judge Saad dissented from the court's decision. *See People v. Lloyd*, No. 186131, 1998 WL 1991901 (Mich. Ct. App. Mar. 31, 1998) (per curiam) (*Lloyd I*).

4.     The prosecutor sought leave to appeal in the Michigan Supreme Court. On the prosecutor's application, the Supreme Court reversed the court of appeals's decision, concluding that counsel did not render deficient performance by failing to pursue an insanity defense. The Supreme Court therefore remanded the matter to the court of appeals for consideration of the remaining issues raised by petitioner in his appeal. Justices Kelly and Cavanagh dissented. *See People v. Lloyd*, 459 Mich. 433, 590 N.W.2d 738 (1999) (*Lloyd II*).

5.     On remand, the court of appeals rejected each of the remaining issues raised by petitioner, except for his claim that the trial court should have conducted a nunc pro tunc

3

competency hearing.  With respect to that issue, the court of appeals remanded the matter to the trial court with instructions to conduct such a hearing.  Judge Saad dissented from this portion of the court's holding, but concurred in the remainder to the court's opinion which rejected petitioner's remaining claims.  *See People v. Lloyd*, No. 186131, 2000 WL 33538517 (Mich. Ct. App. Jan. 25, 2000) (per curiam) (*Lloyd III*).

6.      The Michigan Supreme Court denied the cross-applications for leave to appeal filed by petitioner and the prosecutor, over the dissents of Justices Corrigan, Markman, and Weaver, each of whom would have summarily reversed the court of appeals's decision to remand for a nunc pro tunc competency hearing.  *See People v. Lloyd*, 463 Mich. 990, 623 N.W.2d 590 (2001).  The Supreme Court subsequently granted reconsideration, vacated its order denying leave to appeal, and entered a new order denying both applications for leave to appeal.  *See People v. Lloyd*, 465 Mich. 868, 634 N.W.2d 357 (2001).

7.      The trial court conducted a nunc pro tunc competency hearing, at the conclusion of which the trial court determined that petitioner was competent to stand trial.

8.      Petitioner, through counsel, filed an appeal of the trial court's competency decision, raising the following claims:

    I.      DID THE TRIAL COURT MAKE A MISTAKE OF LAW WHEN IT HELD THAT MR. LLOYD DID NOT HAVE A RIGHT TO PRESENT WITNESSES AT THE COMPETENCY HEARING BECAUSE BOTH DUE PROCESS AND MCL 330.2030 GUARANTEED THAT RIGHT TO MR. LLOYD?  SEPARATELY, DID THE COURT MAKE A MISTAKE OF FACT WHEN, IN EXERCISING ITS PRESUMED DISCRETION ON THIS ISSUE, IT HELD THAT IT DID NOT NEED TO TAKE THE TESTIMONY OF MR. LLOYD'S WITNESSES BECAUSE BOTH OF THE FORENSIC EXPERTS HAD BEEN PROVIDED WITH THESE WITNESSES OPINIONS WHEN IN FACT ONE OF THE EXPERTS HAD NOT BEEN PROVIDED WITH THE INFORMATION AS TO ANY OF THE WITNESSES AND THE OTHER HAD NOT BEEN PROVIDED

4

WITH THE NAME OF THE WITNESS-ATTORNEY WHO HAD INTERVIEWED MR. LLOYD WITHIN SIX MONTHS OF THE TRIAL AND HAD DETERMINED THAT HE WAS UNABLE TO PROVIDE RATIONAL ASSISTANCE TO COUNSEL? WAS THE ERROR PREJUDICIAL BECAUSE THE WITNESS THAT THE COURT BARRED FROM TESTIFYING WOULD HAVE OFFERED SIGNIFICANT EVIDENCE OF INCOMPETENCE, EVIDENCE WHICH WAS NEVER MENTIONED LET ALONE ADDRESSED BY THE TWO FORENSIC EXPERTS?

II. DID THE TRIAL COURT DENY MR. LLOYD THE RIGHT OF CONFRONTATION AND DUE PROCESS AND ALSO VIOLATED [sic] [RULE] 2.003(B)(2) WHEN, WITHOUT NOTICE AND IN FINDING MR. LLOYD COMPETENT, IT RELIED EXTENSIVELY ON ITS OWN PERCEPTION THAT MR. LLOYD WAS COMPETENT EVEN THOUGH THAT PERCEPTION WAS FORMED EXCLUSIVELY ON IT[S] OBSERVATIONS OF MR. LLOYD'S CONDUCT IN THE COURTROOM TEN YEARS EARLIER RATHER THAN ANY DIRECT CONVERSATIONS, INTERVIEWS OR OTHER INTERACTIONS WITH MR. LLOYD AT THAT TIME OR ANY TIME SINCE?

III. AS A MATTER OF DUE PROCESS IS THE ONLY REMEDY PRESENTLY AVAILABLE MORE THAN ELEVEN YEARS AFTER THE TRIAL A RETRIAL RATHER THAN A[] RETROACTIVE COMPETENCY EVALUATION?

IV. MUST THE PRESENT TRIAL COURT JUDGE BE DISQUALIFIED FROM ANY RETROACTIVE HEARING AS A MATTER OF DUE PROCESS BECAUSE IT IS IN FACT AND/OR APPEARANCE UNABLE TO BE IMPARTIAL?

The court of appeals found no merit to these claims, and affirmed the trial court's competency determination. *See People v. Lloyd*, No. 262582, 2006 WL 3826737 (Mich. Ct. App. Dec. 28, 2006) (per curiam) (*Lloyd IV*).

9. Petitioner sought leave to appeal these issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Lloyd*, 479 Mich. 861, 735 N.W.2d 256 (2007).

10. Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus

5

on October 3, 2008.  The Federal Defender Office was subsequently appointed to represent

petitioner.  As grounds for the writ of habeas corpus, he raises four claims:

I.      Counsel failed to adequately investigate and/or present the diminished
        capacity/insanity defense.  Failed to obtain medical records or call mental
        health workers as witnesses.  Failed to request appropriate jury instructions.

II.     Petitioner was denied due process of law when the trial court gave him 1
        week to obtain [a] mental health expert.

III.    Petitioner was denied due process by jury instructions.

IV.     Petitioner was not competent to stand trial and was not allowed to call
        witnesses at [the] nunc pro tunc competency hearing.[1]

11.     Respondent filed his answer on June 12, 2009.  He contends that petitioner's second

through fourth claims are barred by petitioner's procedural default in the state courts, and that all

the claims are without merit or not cognizable on habeas review.

B.      *Factual Background*

        Petitioner's convictions arise from the August 30, 1994, shooting of petitioner's coworker,

Steven Johnson.  The evidence adduced at trial was accurately summarized in the Michigan Court

of Appeals's initial decision on appeal:

        On August 30, 1994, a number of contractors from the Energy Shield
        Company were resurfacing the roof of the Port Huron High School. The supervisor
        for the crew was Steve Johnson. Defendant, an employee of Energy Shield, began
        arguing with Johnson about what time defendant was to call in to work the following
        morning. The argument progressed into a first fight. Defendant was eventually
        restrained but was released after he indicated that he did not wish to fight anymore.
        Defendant then walked to his car and retrieved a gun. He returned to the scene and
        fired several shots at Johnson. Johnson died a short while later from his wounds.
        After the shooting, defendant was arrested at his grandparents' residence. The

---

[1]Petitioner filed only a form application asserting his claims.  He has not filed any brief in
support of the petition, nor has appointed counsel filed a brief in support of the petition or a reply to
respondent's answer.  In analyzing petitioner's claims, therefore, I rely on the briefs filed by petitioner's
counsel in the state courts.

arresting officers testified that he was calm and cooperative. They also noted, however, that he appeared angry and agitated and that he began making spontaneous statements on the way to the police station. He admitted shooting Johnson, told the officers where they could find the rifle, and made a statement to the effect that his life was over. Defendant repeated each statement. When defendant arrived at the police station, he was interviewed by Detective Scott VanSickle. He told the detective that he had been having mental problems and that he had been seeking help at the local mental health facility. VanSickle testified that defendant seemed angry throughout the interview and that he had a hard time staying focused on a particular point.

*Lloyd I*, 1998 WL 1991901, at *1.

The Michigan Supreme Court's opinion more fully summarizes both the pretrial proceedings and the evidence presented at trial, and in light of petitioner's claims is worth reproducing in full:

Defendant Raymond E. Lloyd, Jr., has a history of mental health problems. In the summer of 1994, he visited the St. Clair County Community Mental Health Clinic, seeking help for suicidal thoughts, aggressive feelings, and other problems. As a result of post-trial motions, the file contains a number of reports from this agency, indicating that the defendant was a deeply troubled individual.

In August 1994, the defendant was employed on a roofing crew at Port Huron High School. On a day in late August, an argument broke out, and it included a confrontation between the defendant and his supervisor, Steve Johnson. It appeared momentarily that the argument was over, but the defendant went to his car and retrieved a gun. He shot Mr. Johnson several times, mortally wounding him.

The defendant was charged with open murder and felony-firearm. M.C.L. §§ 750.316, 750.227b; MSA 28.548, 28.424(2).

As a further result of post-trial motions, the file also contains reports and internal memoranda generated during the defendant's stay in jail, while awaiting trial. This material indicates that jail personnel thought him dangerous. One internal memorandum (apparently written by a community mental health worker who assisted at the jail) contains a statement that "there's not a pill in the world that will cure his thinking."

In October 1994, defense counsel moved for a psychiatric examination. The written motion included a statement by counsel that the motion "shall be deemed to be notice of intent to assert the defense of insanity or diminished capacity at the time of trial . . . ."

The prosecutor had no objection, and the circuit court ordered the examination. At the hearing on the motion, defense counsel indicated that insanity "appears to be a defense that will be or may be asserted at the time of trial" and said that the defendant "has insisted that I request on his behalf" a psychiatric examination.

7

Trial was adjourned while the parties awaited the report of Stephen A. Norris, Ph.D., of the Center for Forensic Psychiatry. In January 1995, he submitted a report, twenty-five pages long, concerning the defendant. His conclusion, explained in significant detail, was that there was no indication that the defendant was mentally ill at the time of the shooting. Dr. Norris added that "the defendant acknowledged being aware at the time of the alleged illegal conduct that the conduct in question was illegal" and that "the defendant's behavior at the time of the alleged offense indicates a capacity to conform behavior."

In the wake of Dr. Norris' report, the prosecutor filed a notice that the defense of insanity or diminished capacity would be rebutted with Dr. Norris' testimony.[2]

> [2]. Following receipt of Dr. Norris' CFP report, another short hearing was conducted. The parties were not in dispute with regard to the issue of competency to stand trial, but it was agreed that the court should formally determine the question. The court found the defendant competent.

Trial was set to begin on March 14, 1995. On March 13, 1995, the court received from the defendant a handwritten letter, dated several days earlier. He asked for an independent examination, apparently in hopes that a second examiner would come to a different conclusion than Dr. Norris.[3]

> [3]. Defense counsel promptly sought an adjournment, filing a motion that included these paragraphs:
> 3. Based upon the circumstances of the case, the forensic report and numerous conferences with Defendant it was counsel's recommendation to withdraw or abandon the insanity defense and proceed on a state of mind defense theory.
> 4. Notwithstanding counsel's recommendation, Defendant is aware of his right to an independent psychological examination pursuant to M.C.L.A. § 768.20a(2) . . . and became insistent upon asserting that right in the week immediately [preceding] the scheduled [trial] date.

The independent examiner was Virginia O'Reilly, O.P., Ph.D., who had come to Port Huron in September 1994 after years of practice in other states. Evaluating the defendant, she administered the Rust Inventory of Schizotypal Cognitions (RISC), as well as the Minnesota Multiphasic Personality Inventory-2 (MMPI-2).

On the basis of the RISC, Dr. O'Reilly concluded that the defendant showed "'substantial disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality or ability to cope with the ordinary demands of life.'"

With regard to the MMPI-2, Dr. O'Reilly said that the test provided a "substantial indication" that the defendant might have "mental confusion or real

psychopathology." However, she also noted that the defendant had "responded to the MMPI-2 items in an extremely exaggerated manner, endorsing a wide variety of rare symptoms and attitudes." She said that "[t]hese results may stem from a number of factors that include excessive symptom checking, falsely claiming psychological problems, low reading level, a plea for help or a confused state."

Called at trial as a defense witness, Dr. O'Reilly said, "The diagnosis I'm making, I believe there's information to indicate that the schizotypal personality disorder, and the paranoid personality disorder are possible diagnoses." Asked whether this personality disorder is "the same thing as insanity," Dr. O'Reilly answered, "Not at all."

Testifying on his own behalf, the defendant admitted the shooting, and offered a detailed explanation of the events leading up to the assault. He summed it all up, "I was psychologically out of my head."

The final witness was Dr. Norris, who offered the opinion that the defendant was not mentally ill.

In closing argument, defense counsel offered a strong argument that was based on the testimony of the defendant and Dr. O'Reilly. Disclaiming an intention to persuade the jury that the defendant was wholly innocent, he argued that the defendant did not have the state of mind necessary for a conviction of premeditated murder. It is evident that his argument was designed to bring the jury to the conclusion that this was voluntary manslaughter.

Nevertheless, the jury convicted the defendant, as charged, of first-degree murder and felony-firearm. The circuit court imposed the mandatory life and two-year sentences.

*Lloyd II*, 459 Mich. at 434-38, 590 N.W.2d at 738-40 (some footnotes omitted).

In conjunction with his direct appeal, petitioner filed a motion for new trial in the trial court on the ineffective assistance of counsel issue. The trial court held two hearings on the motion, which consisted of the testimony of petitioner's trial counsel and various exhibits. Again, the Supreme Court accurately detailed the evidence presented at the hearings:

At the hearing, the defendant's trial attorney explained that the defendant had originally wanted him to pursue the defense of insanity. However, his judgment had been that an insanity defense was not consistent with the facts. Counsel said that the events of the shooting, as described by the defendant himself, had been too purposeful:

He had some very explicit reasons for doing what he was doing, and that kind of statement from him totally negates, in my view, any argument of insanity and any argument of diminished capacity, because it was very clear to me in our discussions that he

had the ability to formulate specific intent, he had the ability to know right from wrong, he had the ability to conform his conduct to the law because he knew what he was doing. He was engaged in conduct that he had, had set out to perform. That's the problem. And, and because of that, and Ray's explanation of it was very good. It was very good. It made sense. I didn't want to pursue any of that. I mean, I wanted to explore it, I felt I had an obligation to explore it and I felt that we did explore it, but I had decided, and I had talked with Ray and I had let other people know, I mean, this was no big secret, are you going to raise insanity? Are you going to pursue those kinds of issues? And after spending a lot of time talking with him, it was my conclusion that that was not a wise strategy to take for many many years [sic]. And, and that a factual defense that dealt with intent, that dealt with physical evidence, that dealt with the testimony that we'd elicited so far at the time of the preliminary examination, what I expected to be able to prove and show at the time of trial, I felt that that was a much sounder strategy, and it avoided all of the problems and, and the skepticism that goes along with insanity and diminished capacity and state of mind defenses. That all changed. That all changed. That was not our intent. And when I say "our," I do mean "our."

Asked about the role that Dr. Norris' report had played in his evaluation of the viability of the insanity defense, counsel characterized it as a "distant second." He acknowledged that he reached this decision without reviewing records from the community mental health agency, the hospital, or the jail.

Although counsel and the defendant had settled on a defense (lack of premeditation), the defendant then filed his handwritten request for an independent examination. That changed the course of the defense and, in the words of counsel, "things happened from that point on."

As trial approached, there had been some difficulties in getting Dr. O'Reilly's report, but it was eventually filed. Her conclusions provided support for a defense of diminished capacity, but she felt there was no sign of insanity. Asked about his approach to the case at that point, counsel explained:

Well, if the question is, you know, did I make a determination that there was no basis for an insanity defense, the answer to that is yes. And I did that after talking with Doctor Norris-or Doctor O'Reilly, because I have an expert. She is the one that has to support it, and if she tells me after reviewing the jury instruction, and based upon all of the experience that she, that she cannot support that, then it doesn't exist as far as I'm concerned, as a viable defense. So we move on to what we can support, and what she told me she would support in connection with the jury instruction being the law, was a diminished capacity argument. So that's what we prepared.

Counsel's judgment was that a defense of this sort required firm support from his own expert-he twice testified that, in his experience, cases are not won through

cross-examination of the other side's expert.

On cross-examination at the hearing on the motion for new trial, counsel further explained his view that the insanity defense did not fit the facts of this case:

> After I talked with Mr. Lloyd and he explained to me, I mean what he did and why he did it, he, his description of the events were very detailed to me. His-even though his, his motivation may have been somewhat strange or unusual, that is never a surprise, but after talking with him and, and discussing with him the issue that was foremost in my mind, and that is his intent, and what was he doing and why was he doing it, what was he thinking, it was very clear to me early on that the best strategy was to work within those parameters, because Raymond Lloyd had a very detailed recollection of what occurred. He recalled the events very clearly, and he had some specific reasons for doing what he did. Albeit the reasons may have been misguided reasons, he knew exactly what he was doing[.]
>
> Now, form [sic], taking that and putting that in the context of insanity or diminished capacity, that was a real problem. A real problem. A real problem because he had the ability to formulate specific intent based upon the discussions that I had with him. And if he so testified, that would become fairly clear. With Doctor O'Reilly's testimony there was now another possible explanation.

Counsel also offered his opinion that a defense presentation should be clear, and not premised on alternative theories. Asked whether he had been able to integrate Dr. O'Reilly's view into the defense that he had previously been preparing, counsel replied:

> Somewhat, but not the way I would have liked, and, and let me explain. I had, as you know, I had set out on a strategy that was a factual defense, and if we're really going to talk about a factual defense, then-or, strike that. If we're really going to talk about an insanity or diminished capacity, or state of mind defense, we really don't need to spend a great deal of time talking about the facts. But I've been in court enough times, and I've argued enough times before a jury that I'm going to do everything I can to not get caught talking out of both sides of my mouth, and I see standing before the jury and, and openly arguing diminished capacity or state of mind defense on the one hand, and then arguing a purely factual defense on the other hand, is being somewhat inconsistent. But what my attempt was, to try to do a little of both. And the reason perhaps that this trial dragged out as long as it did is because I felt I did spend a lot of time on the cross-examination of the People's witnesses to attempt to elicit some of the facts that I would have liked to have argued had we gone strictly on a factual defense. At least put that information out there on the record before the jury so that any reasonable person could sit back and say hey, this might be another, another way to look at all of these

11

things. But as a practitioner standing before 12 people, I'm not going
to argue both, two different theories, which I view to be inconsistent.
I think that doesn't suit them. So I didn't . . .

Asked a moment later for "an opinion about the viability of insanity or
diminished capacities in this county," counsel responded:

My opinion as a practitioner, and specifically as a defense
practitioner, it's the last argument that I would want to try to make .
. .

The circuit court denied the motion, saying that the record provided no
suggestion that counsel "was in any way remiss, was in any way acting on any
standard lesser than that that is required of any good, competent, criminal defense
lawyer handing [sic] this type of case. . . ."

After the court denied the defendant's motion, he filed an amended motion
for new trial, supported by several affidavits. In one of these, appellate counsel
recounted Dr. O'Reilly's post-trial conclusion, "I blew it." In the words of appellate
counsel, "She added that she believes that Mr. Lloyd does meet the statutory
definition of insanity, that her prior opinion of sanity was not based on the statutory
definition but on her opinion that Mr. Lloyd was not necessarily psychotic, and that
her error was due on [sic] her unfamiliarity with the specialized definition of insanity
under criminal law."

In a separate affidavit, appellate counsel said that he provided Dr. O'Reilly
with materials from the community mental health agency and the county jail, and
that these materials (which had not been provided before she testified at trial)
supported her revised conclusions. Appellate counsel also filed two other affidavits,
concerning conversations with the defendant's cousin and mother, both of whom
spoke of his mental health problems.

The amended motion was heard in March 1996. The assistant prosecutor
argued that the case now involved "dueling experts, with the same expert being on
both sides of the issue at different times. . . ." The circuit court again denied the
motion.

*Lloyd II*, 459 Mich. at 438-43, 590 N.W.2d at 740-42 (footnotes omitted).

Following remand for a competency hearing, the trial court considered various reports and

exhibits, as summarized by the Michigan Court of Appeals:

On remand, licensed psychologist Jeffrey Davis of the Center for Forensic
Psychology performed a competency evaluation of defendant and wrote a detailed
report in which he concluded that defendant was competent to stand trial at the time
of trial. Defendant then requested that he be permitted to have an independent
competency evaluation performed, and the trial judge agreed. David A. Vore, Ph.D.,
of Genesee Psychological Resources, P.C., performed this second independent
examination. He too concluded that defendant was competent to stand trial. Primarily

12

> considering these two reports and his own observations of what occurred during trial, the trial judge concluded that defendant was competent to stand trial.

*Lloyd IV*, 2006 WL 3826737, at *2.[2]  In addition to this evidence generated post-remand, one month before the murder (and eight months before the trial) Anna Malawka performed an intake assessment of petitioner for Community Mental Health (CMH).  Her report "indicates that [petitioner] was composed, but also states that he had 'illusions [sic] of grandeur,'" and that his "stream of thought was tangential."  *Id*.  The tentative diagnosis was to rule out as clinical syndromes paranoid schizophrenia and delusional disorder, and personality disorder diagnosis of intermediate explosive disorder.  *See id*.  Although the trial court did not permit Malawka to testify at the competency hearing, her report was admitted as evidence and was considered by the two post-remand experts.  *See id*.  Further, in an internal document CMH jail liaison David Baer "referenced the fact that he believed [petitioner] was suffering from delusional thinking."  *Id*. at *3.  Again, the trial court did not permit Baer to testify, but "Baer's opinions were already contained in the trial court record and referenced by both experts' reports concerning defendant's competency to stand trial."  *Id*.  Finally, petitioner sought to present the testimony of Paulette Williams, his mother, and Roni Lloyd, his cousin.  According to petitioner, these witnesses "would have testified that [petitioner's] mental health was declining before the shooting, and that his thinking became even more illogical following his arrest."  *Id*.  The trial court did not hear the testimony of these two witnesses.

C.    *Procedural Default*

Respondent first contends that petitioner's claims are barred by petitioner's procedural default in the state courts, for various reasons.  For example, respondent contends that petitioner's

---

[2]The various reports addressed here and below are not included in the state court record filed with this Court.  No party, however, appears to dispute the court of appeals's summary of the reports, nor did petitioner dispute that summary in his brief on appeal from the court of appeals's decision.

claim that he had only one week to secure an expert is defaulted because petitioner did not request a continuance in the trial court.  Further, respondent contends that petitioner's jury instruction claim is barred because he did not object to instructions in state court.  Respondent likewise contends that petitioner's competency claim is barred because he failed to preserve the claim in the trial court.

Here, the complex procedural history of this case makes it appropriate to bypass the procedural default inquiry and proceed directly to the merits.  For one example, with respect to petitioner's jury instructions claim petitioner contends that counsel was ineffective for failing to request the instructions on mental illness and insanity.  If petitioner's position is correct, counsel's ineffectiveness may constitute cause to excuse any procedural default.  *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Respondent counters that this portion of petitioner's ineffective assistance claim is unexhausted, because it was not presented on direct appeal.  However, this aspect of petitioner's ineffective assistance claim was clearly presented in petitioner's response to the prosecutor's application for leave to appeal to the Michigan Supreme Court, and the record filed by respondent does not include petitioner's appellate brief in *Lloyd I*.  It is thus difficult to determine whether petitioner's jury instruction claim is, in fact, defaulted.

While the procedural default doctrine precludes habeas relief on a defaulted claim, the procedural default doctrine is not jurisdictional.  *See Trest v. Cain*, 522 U.S. 87, 89 (1997).  Thus, while the procedural default issue should ordinarily be resolved first, "judicial economy sometimes dictates reaching the merits of [a claim or claims] if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated."  *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999) (internal citations omitted); *see also*, *Lambrix v. Singletary*, 520 U.S. 518, 524-

14

25 (1997) (noting that procedural default issue should ordinarily be resolved first, but denying habeas relief on a different basis because resolution of the default issue would require remand and further judicial proceedings); *Walter v. Maass*, 45 F.3d 1355, 1360 n.6 (9th Cir. 1995). As explained below, petitioner's claims are readily resolved on the merits. In light of the complex state court history of this case, the Court should proceed directly to the merits rather than resolve the petition on the basis of respondent's exhaustion and procedural default arguments.

D.      *Standard of Review*

        Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

        "[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are

15

materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."  Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  *Williams*, 529 U.S. at 412.  Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not

16

require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

E.      *Ineffective Assistance of Counsel (Claim I)*

Petitioner contends that counsel was ineffective in a number of respects, all related to his general claim that counsel should have investigated and presented diminished capacity and insanity defenses. More specifically, petitioner contends that counsel was ineffective for failing to adequately investigate the defenses, obtain medical records and mental health witnesses, and request related jury instructions. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed  questions of law and fact. *Id*. at 698. Further, "[t]here is no reason for

17

a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. It is petitioner's burden to establish the elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same).

As the Supreme Court has recently explained, *Strickland* establishes a high burden that is difficult to meet, made more so when the deference required by § 2254(d)(1) is applied to review a state court's application of *Strickland*:

> "Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve.

18

*Strickland*, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.

      Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ----, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S.Ct. at 1420 . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

    2.    *Analysis*

Applying *Strickland*, the Michigan Supreme Court rejected petitioner's ineffective assistance claims, concluding both that counsel's performance was not deficient and that petitioner was not prejudiced by counsel's alleged failures.  With respect to performance, the court explained that counsel "set in motion the initial steps for presenting [an insanity] defense," by filing a notice of insanity defense and arranging for a Center for Forensic Psychiatry (CFP) evaluation, and by obtaining the services of an independent expert when, "despite an earlier agreement regarding defense strategy, [petitioner] filed his handwritten request for an independent investigation." *Lloyd II*, 459 Mich. at 449-50, 590 N.W.2d at 745.  After both the CFP and independent examiners concluded that petitioner was not legally insane, "counsel presented to the jury a merged defense

of no premeditation and diminished capacity." *Id*. at 450, 590 N.W.2d at 745.  Based on these facts and counsel's testimony at the evidentiary hearing, the Supreme Court concluded that counsel's "strategy was entirely reasonable[.] . . .  If successful, he might have been able to reduce the judgment to voluntary manslaughter, which would certainly be a favorable verdict on the facts of this case." *Id*.     Turning to prejudice, the Supreme Court rejected the court of appeals's determination that petitioner had suffered prejudice from counsel's performance.  The court of appeals reasoned that

> [h]ad counsel obtained defendant's mental health records, given them to O'Reilly, informed O'Reilly of the legal definitions of insanity and mental illness, cross-examined the prosecution's expert witness regarding the findings of mental health workers who believed that defendant was insane, subpoenaed the mental health workers that had previously evaluated defendant, and requested that the trial court . . . give the appropriate instructions prior to the experts' testimony and again at the conclusion of trial, the jury may well have returned a verdict of guilty but mentally ill.

*Lloyd I*, 1998 WL 1991901, at *2.  The Supreme Court rejected this reasoning, explaining that because "a person found guilty of first-degree murder, but mentally ill, still must serve life in prison[,] . . . [the] failure to obtain such a verdict would scarcely constitute prejudice to the defendant."  *Lloyd II*, 459 Mich. at 451, 590 N.W.2d at 745.  The Court should conclude that these determinations were reasonable.

Counsel testified that he formed his initial strategy of a "factual defense," that is, one attacking the premeditation element of first degree murder.  Counsel explained that the CFP report and petitioner's own recall of the incident and statements regarding his intent made a defense of insanity or diminished capacity problematic, a problem made more acute by Dr. O'Reilly's opinion that petitioner was not legally insane.  *See Lloyd II*, 459 Mich. at 441, 590 N.W.2d at 741.  He also testified that, in his experience, it is not beneficial to argue two inconsistent defense theories to the

20

jury, such as a factual defense and insanity.  *See id*. at 442, 590 N.W.2d at 741-42.  Nevertheless, because petitioner himself had requested an independent evaluation, counsel attempted to integrate Dr. O'Reilly's views into the defense, to "[a]t least put that information out there on the record before the jury so that any reasonable person could sit back and say hey, this might be another, another way to look at all of these things."  *Id*.

      It was reasonable for counsel to conclude that a general attack on the sufficiency of the mental state elements of the murder charge, supplemented by Dr. O'Reilly's view of petitioner's mental condition, presented the best chance for a favorable outcome in the form of a conviction on a lesser offense of second degree murder or voluntary manslaughter.  Decisions about what defenses to pursue or not pursue are "[a]mong the 'virtually unchallengeable' tactical decision left to the judgment of trial counsel."  *Gluzman v. United States*, 124 F. Supp. 2d 171, 174 (S.D.N.Y. 2000).  "Many courts have concluded that a decision not to present inconsistent defenses cannot be condemned as ineffective."  *Wilson v. United States*, 414 F.3d 829, 831 (7th Cir. 2005) (citing cases); *see Jackson v. Shanks*, 143 F.3d 1313, 1326 (10th Cir. 1998) ("Trial counsel's decision not to present inconsistent defense theories does not constitute ineffective assistance.").  Here, the record reveals that counsel's "decision not to proffer an insanity [or diminished capacity] defense was a 'conscious and informed' tactical one."  *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997).  In reaching his decision, counsel relied on petitioner's own statements regarding the shooting, which indicated  that petitioner knew what he was doing, and knew that it was wrong.  Thus, "[c]ounsel could reasonably surmise from his conversation with [petitioner] that . . . psychological evidence would be of little help."  *Strickland*, 466 U.S. at 699; *see also*, *id*. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements

21

or actions. . . . [W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."). Moreover, both the state expert and the independent expert testified that petitioner did not meet the legal definition of insanity at the time of the crime. In light of this evidence and petitioner's own statements, counsel's decision not to pursue fully an insanity or diminished capacity defense was a reasonable tactical decision. It therefore follows that the Michigan Supreme Court's application of the deficient performance prong of the *Strickland* test was reasonable.

Likewise, petitioner cannot establish that he was prejudiced by counsel's failure to present an insanity or diminished capacity defense. Petitioner contends that the presentation of additional medical evidence regarding his mental illness and appropriate instructions would have supported a finding that he was either insane or acting under a diminished capacity to form the intent necessary for first degree murder. The record, however, does not support the conclusion that but for counsel's failure to adduce this evidence and request these instructions there is a reasonable probability that the result of the proceeding would have been different. With respect to insanity, there is no evidence that petitioner was legally insane at the time of the crime. Both the state expert and the independent expert testified at trial that petitioner was not legally insane at the time of the crime. In the state court proceedings, petitioner made much of an affidavit filed by his appellate counsel, in which counsel indicates that Dr. O'Reilly told him that she "blew it," that she then believed that petitioner met the legal definition of insanity, and that her testimony at trial was based not on the statutory definition of insanity but on her conclusion that petitioner was not psychotic and her error was due to her unfamiliarity with the legal definition of insanity under the criminal law. *See Lloyd II*, 459

Mich. at 442-43, 590 N.W.2d at 742.  Subsequently, however, Dr. O'Reilly submitted her own affidavit contradicting these assertions and affirming her trial testimony.  *See Lloyd*, 463 Mich. at 990 n.1, 623 N.W.2d at 591 n.1 (Corrigan, J., dissenting from denial of leave to appeal).  Despite the numerous appeals and postconviction proceedings in the state courts, petitioner has presented no report, affidavit, or testimony from any expert who would have testified that petitioner was legally insane at the time of the crime.  Thus, petitioner cannot show that he was prejudiced by counsel's failure to present an insanity defense.

Nor can petitioner show that counsel was ineffective for failing to more fully present a diminished capacity defense, for two reasons.  First, although at the time of petitioner's trial the lower Michigan courts assumed such a defense was viable, after petitioner's trial the Michigan Supreme Court concluded that the diminished capacity defense, if it ever existed, did not survive the Michigan Legislature's enactment of the insanity statute.  The Supreme Court held that the detailed procedures for asserting an insanity defense set forth in the statute signifies the legislature's intent "not to allow evidence of a defendant's lack of mental capacity short of legal insanity to avoid or reduce criminal responsibility by negating specific intent.  Rather, the insanity defense as established by the Legislature is the sole standard for determining criminal responsibility as it relates to mental illness or retardation."  *People v. Carpenter*, 464 Mich. 223, 241, 627 N.W.2d 276, 285 (2001); *see also*, *Patterson v. Metrish*, No. 2:08-CV-12041, 2010 WL 5280815, at *7-*8 (E.D. Mich. Dec. 17, 2010) (Battani, J.).  In these circumstances, the Supreme Court's decision in *Lockhart v. Fretwell*, 506 U.S. 364 (1993), bars a finding of prejudice.  In *Lockhart*, the defendant was convicted of capital felony murder.  During the penalty phase, the government argued, and the jury accepted, that evidence presented during the guilt phase established the murder was committed

23

for pecuniary gain.  Because the jury found that this aggravating factor existed, the jury sentenced Fretwell to death.  *See id*. 366.  Fretwell filed a petition seeking a writ of habeas corpus under 28 U.S.C. § 2254, arguing ineffective assistance of counsel for counsel's failure to raise an objection to the presentation of the aggravating factor to the jury, based on the case of *Collins v. Lockhart*, 754 F.2d 258 (8th Cir.1985), which was governing law in the Eighth Circuit at the time of the defendant's trial and which had held that "a death sentence is unconstitutional if it is based on an aggravating factor that duplicates an element of the underlying felony."  *See Lockhart*, 506 U.S. at 367.  *Collins* was overruled by another Eighth Circuit decision, but not until after Fretwell's sentencing. On habeas review, both the district court and Eighth Circuit Court of Appeals found that Fretwell established prejudice based on his counsel's failure to object under *Collins*, because such an objection would have succeeded at the time.  *Id*. at 367-68.

The Supreme Court reversed the Eighth Circuit, holding that "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him."  *Id*. at 369-70 (footnote omitted).  Because *Collins* was overruled in a later case, the defendant could not establish prejudice, as "unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him."  *Id*. at 372.  *Lockhart* thus establishes that "the court making the prejudice determination may not consider the effect of an objection it knows to be wholly meritless under current governing law, even if the objection might have been considered meritorious at the time of its omission."  *Id*. at 374 (O'Connor, J., concurring).  Here, petitioner claims that he

24

would have benefitted from counsel's presentation of a defense which is no longer recognized under Michigan law. As in *Lockhart*, although such a defense may have been viable at the time of petitioner's trial, it is now clear that counsel's alleged deficient performance did not "deprive [petitioner] of any substantive or procedural right to which the law," as it is now understood, "entitles him." *Lockhart*, 506 U.S. at 372. Thus, petitioner cannot show that he was prejudiced by counsel's failure to more fully investigate and present a diminished capacity defense.[3]

Second, even if *Lockhart* does not preclude a finding of prejudice, petitioner has failed to establish a reasonable probability that a diminished capacity defense would have succeeded under the law as it stood at the time of petitioner's trial. Under Michigan law at the time of petitioner's trial, "[t]he defense of diminished capacity is available only where it is shown that a defendant's impairment rendered him unable to formulate the specific intent to commit a crime; it is not available where testimony establishes only that a defendant could not fully appreciate the consequences of his acts." *People v. Denton*, 138 Mich. App. 568, 573, 360 N.W.2d 245, 248 (1984). Here, counsel presented to the jury evidence of petitioner's mental illness, and the jury was instructed both on the diminished capacity defense and on the mental state elements of first degree murder. Dr. O'Reilly, however, testified that petitioner "could take specifically intended actions," *Lloyd I*, 1998 WL 1991901, at *2, thus rebutting a diminished capacity defense. As with insanity, petitioner has pointed to no expert able and willing to testify that he was unable to formulate the specific intent to commit the crime. Although petitioner contends that counsel should have

---

[3]To see why this conclusion makes sense, consider the effect of a finding that counsel was ineffective for failing to present a diminished capacity defense. The effect of such a conclusion would be to afford petitioner a new trial. At that new trial, however, petitioner would not be able to present a diminished capacity defense, because such a defense is no longer recognized. Thus, the remedy for a trial in which counsel failed to present diminished capacity evidence is a new trial in which counsel would be precluded from presenting such evidence.

presented additional medical records, these would have gone to the existence of a mental impairment, a fact already before the jury.  What is lacking in these records and in the state court post-conviction proceedings is any evidence supporting petitioner's claim that he lacked the ability to form the intent to kill the victim.  Thus, petitioner cannot show that he was prejudiced by counsel's failure to more fully investigate and present a diminished capacity defense.

Finally, contrary to the Michigan Court of Appeals's initial holding, *see Lloyd I*, 1998 WL 1991901, at *2, petitioner cannot show that he was prejudiced by counsel's actions because, had counsel presented additional evidence or requested additional instructions, he might have been found guilty but mentally ill.  As the Michigan Supreme Court explained, "a person found guilty of first-degree murder, but mentally ill, still must serve life in prison."  *Lloyd II*, 459 Mich. at 451, 590 N.W.2d at 745 (citing MICH. COMP. LAWS §§ 750.316(1), 768.36(3), 791.234(6)).  Thus, even if counsel had secured a guilty but mentally ill verdict, petitioner's circumstances would not have changed: he would still be serving a mandatory sentence of life imprisonment without possibility of parole.  A defendant found guilty but mentally ill may be entitled by statute to treatment for his mental illness in prison, *see* MICH. COMP. LAWS § 768.36(3), but it would not have affected petitioner's sentence, and thus he cannot demonstrate prejudice.  *See Parker v. Turpin*, 60 F. Supp. 2d 1332, 1350 (N.D. Ga. 1999).

In short, the Michigan Supreme Court reasonably applied *Strickland* in determining both that counsel's performance was not deficient and in determining that petitioner suffered no prejudice from counsel's performance.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his ineffective assistance of counsel claims.

F.      *Time to Secure Mental Health Expert (Claim II)*

26

Petitioner next contends that he was denied a fair trial when he was given only one week to secure a mental health expert prior to trial. Although not phrased as such, petitioner's claim is essentially that the trial court should have granted a longer continuance to secure a mental health expert. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

      1.    *Clearly Established Law*

Although the Supreme Court has not more specifically set forth governing standards to determine when a failure to grant a continuance will constitute a denial of the right to present a meaningful defense, the Court has noted that the grant or denial of a motion for a continuance is within the sound discretion of the trial judge, and will be reviewed only for an abuse of that discretion. *See Avery v. Alabama*, 308 U.S. 444, 446 (1940). The Court has also explained that "[i]t would take an extreme case to make the action of the trial court in such a case a denial of due process of law." *Franklin v. South Carolina*, 218 U.S. 161, 168 (1910). "The matter of a continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel." *Unger v. Sarafite*, 376 U.S. 575, 589 (1964). At the same time, "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality." *Id*. In short, "broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to assistance of counsel." *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (quoting *Unger*, 376 U.S. at 589). Importantly, denial of a continuance amounts to a due process violation warranting habeas relief only where the petitioner shows that he was prejudiced by the omission of the evidence he would

27

have procured had the continuance been granted. *See Mackey v. Dutton*, 217 F.3d 399, 408 (6th Cir. 2000); *cf. United States v. Allen*, 247 U.S. 741, 771 (8th Cir. 2001) (applying same standard in case on direct review); *United States v. Hall*, 200 F.3d 962, 964 (6th Cir. 2000) (same).

      2.    *Analysis*

      Here, the trial court granted petitioner a one week continuance to secure a mental health expert, as requested by defense counsel. Neither petitioner nor counsel requested a longer extension of time. Nevertheless, even assuming that a trial court has a duty to *sua sponte* grant a continuance not requested by the parties in certain circumstances, petitioner cannot show a due process violation here because he cannot show that he was prejudiced by the omission of evidence which he would have procured had the trial judge granted a longer continuance. Petitioner contends that, because of the short time he had to obtain an expert, he was forced to employ an expert who had never performed a criminal responsibility evaluation and who was unable to adhere to professional standards. At the outset, this claim is not supported by the record. Dr. O'Reilly's testimony at trial does not suggest that she was unfamiliar with either the legal or medical issues involved, or that she did not have adequate time to review the facts and interview petitioner. Petitioner's claim is, apparently, based on appellate counsel's assertion that Dr. O'Reilly told him that she did not understand the legal definition of insanity, and that medical records she did not review before trial would have altered her opinion. However, as explained above, Dr. O'Reilly provided her own affidavit, which contradicts the assertions of appellate counsel and reaffirms her trial testimony. *See Lloyd*, 463 Mich. at 991 at n.1, 623 N.W.2d at 591 n.1 (Corrigan, J., dissenting from denial of leave to appeal). Further, as noted above, despite the numerous postconviction proceedings and the many years since petitioner's conviction, petitioner has not presented a single affidavit or report from

28

another psychiatric expert opinion that he was legally insane at the time of the crime or was operating under a diminished capacity to form the specific intent necessary for first degree murder. In these circumstances, petitioner has failed to show that he was denied due process by the trial court's failure to give him more than a one week continuance. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.    *Jury Instructions (Claim III)*

Petitioner next contends that he was denied a fair trial by the trial court's failure to give the jury definitions of mental illness and diminished capacity, and to give an instruction on the verdict of guilty but mentally ill. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

    1.    *Clearly Established Law*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws). Thus, in order for habeas corpus relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous or universally condemned; rather, taken as a whole, they must be so infirm that they rendered the entire trial fundamentally unfair. *See Estelle*, 502 U.S. at 72 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Wood v. Marshall*, 790 F.2d 548, 551-52 (6th Cir. 1986); *cf. United States v. Sheffey*, 57 F.3d 1419, 1429-30 (6th Cir. 1995) (standard of review for jury instructions challenged on direct

29

criminal appeal). As the Supreme Court noted in *Estelle*, the Court should "also bear in mind [the Supreme Court's] previous admonition that we 'have defined the category of infractions that violate "fundamental fairness" very narrowly.'" *Estelle*, 502 U.S. at 72-73 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). If an instruction is ambiguous and not necessarily erroneous, it can run afoul of the Constitution only if there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. *See Estelle*, 502 U.S. at 72 & 73 n.4; *Boyde v. California*, 494 U.S. 370, 380 (1990). In short, instructional errors of state law will rarely form the basis for federal habeas corpus relief. *See Estelle*, 502 U.S. at 71-72.

2.      *Analysis*

In reviewing petitioner's jury instruction claims for plain error after remand from the Michigan Supreme Court, the Michigan Court of Appeals concluded that the instructional errors complained of were harmless. With respect to the mental illness and diminished capacity instructions, the court noted that Dr. O'Reilly opined that petitioner was capable of forming the intent necessary for first degree murder, and that the jury was instructed on diminished capacity prior to deliberations. Thus, although the lack of a mental illness and diminished capacity instruction prior to Dr. O'Reilly's testimony "deprived the jury of a framework in which to consider Dr. O'Reilly's testimony that [petitioner] was mentally ill," the error was harmless. *See Lloyd III*, 2000 WL 33538517, at *1. With respect to the guilty but mentally ill instruction, the court of appeals explained that the failure to give such an instruction was harmless in light of the Supreme Court's determination that, "because a person found guilty but mentally ill of first-degree murder still must serve life in prison, the 'failure to obtain such a verdict would scarcely constitute prejudice to [petitioner].'" *Id*. at *2 (quoting *Lloyd II*, 459 Mich. at 451, 590 N.W.2d at 745). The Court

should conclude that these determinations were reasonable.

Prior to deliberations, the trial court gave detailed instructions to the jury on the mental state elements of first degree murder, as well as on diminished capacity. *See* Trial Tr., dated 3/30/95, at 1161-63. The court reinstructed the jury on these matters upon request from the jury after it had begun deliberating. *See id.* at 1180-82. Thus, the mental state elements and diminished capacity were adequately explained to the jury before and during its deliberations. It is true that the instruction did not define the term mental illness, but the instruction given by the court actually granted the jury more leeway to find in petitioner's favor than the law required. Under the law at the time of petitioner's trial, a diminished capacity defense required a finding by the jury that the defendant was actually mentally ill. *See Lloyd III*, 2000 WL 33538517, at *1 (citing *People v. Pickens*, 446 Mich. 298, 521 N.W.2d 797 (1994)). The court's instructions, however, allowed the jury to consider petitioner's general "mental condition" and "history of mental problems," without requiring it to find that petitioner actually suffered from a defined "mental illness." *See* Trial Tr., dated 3/30/95, at 1162, 1181. Thus, the trial court's failure to define "mental illness" inured to petitioner's benefit, and he cannot show that he was denied a fair trial by the lack of a definition of mental illness.

Nor can petitioner show that he was denied a fair trial by the absence of a diminished capacity instruction prior to Dr. O'Reilly's testimony. It is true that Michigan law provides that "[i]f the defendant asserts a defense of insanity in a criminal case which is tried before a jury, the judge shall, before testimony is presented on that issue, instruct the jury on the law . . . ." MICH. COMP. LAWS § 768.29a. However petitioner has cited and I have found no caselaw suggesting that such a preliminary instruction is required as a matter of due process, or that the absence of such a

31

preliminary instruction deprives a defendant of a fair trial. Moreover, petitioner cannot show how the absence of such an instruction deprived him of a fair trial. Section 768.29a requires a trial court to provide the statutory definitions of "mental illness" and "insanity." *Cf. People v. Cramer*, 201 Mich. App. 590, 595, 507 N.W.2d 447, 450 (1993); *People v. Mangiapane*, 85 Mich. App. 379, 394, 271 N.W.2d 240, 248 (1978). Here, insanity was not at issue, as petitioner did not present an insanity defense. And although the court did not give an instruction defining mental illness, there was significant evidence presented regarding petitioner's mental condition, and the issue before the jury under the trial court's more lenient diminished capacity instruction was whether petitioner's mental condition rendered him unable to form the specific intent necessary for first degree murder. The prosecutor did not argue that petitioner's diminished capacity defense should be rejected on the basis that he did not suffer from a mental illness; rather, the prosecutor argued that petitioner had the capacity to form the specific intent to kill and in fact did so. In light of the evidence presented, the arguments of the parties, and the court's final instructions to the jury, petitioner cannot show that the trial court's failure to define "mental illness" for jury prior to Dr. O'Reilly's testimony deprived him of a fair trial.

Likewise, petitioner cannot show that he was denied a fair trial by the absence of on instruction on the verdict of guilty but mentally ill. First, it appears that counsel declined to request such an instruction as part of his deliberate strategy of presenting a combined factual/diminished capacity defense attacking the mental state elements of the offense. Presentation of a guilty but mentally ill strategy would have required at least a tacit admission that the elements of the first degree murder charge were satisfied, and in counsel's eyes may have provided an alternative avenue for the jury to accept petitioner's defense but still find him guilty. In these circumstances, counsel

32

reasonably chose to forgo an instruction on guilty but mentally ill, *see Bellman v. Palmer*, No. 07-12507, 2009 WL 4950554, at *11 (E.D. Mich. Dec. 15, 2009),[4] and petitioner was not denied a fair trial by the trial court's refusal to *sua sponte* give an instruction which counsel did not want given.

More fundamentally, the absence of a guilty but mentally ill instruction did not prejudice petitioner in any way that raises a federal constitutional issue. As noted by the Michigan Supreme Court, the consequences of a guilty but mentally ill verdict are precisely the same as a guilty verdict–in this case, imprisonment for life without possibility of parole. The absence of a guilty but mentally ill verdict may have deprived petitioner of a statutory right to treatment, but I have found no cases suggesting that this fact raises any federal constitutional issue.[5] On the contrary, whether or not a person was mentally ill at the time he committed an offense is not an element of any offense, and does not implicate any federal constitutional issues. As another judge of this Court has explained in rejecting a sufficiency of the evidence claim premised on the petitioner's claim that the evidence instead supported a finding of guilty but mentally ill:

> [W]hether the defendant is mentally ill or not mentally ill is not an element of any criminal offense. Therefore, a challenge to the evidence pertaining to this matter is not reviewable in habeas corpus.
>     One legislative object in creating the classification of guilty but mentally ill vis-a-vis simply guilty was to assure that the former would be provided mental health treatment. *People v. Booth*, 414 Mich. 343, 353-354, 324 N.W.2d 741 (1982). This

---

[4]Indeed, the federal courts have considered numerous due process challenges to guilty but mentally ill statutes premised precisely on the claim that such statutes unfairly coerce juries to reject insanity defenses and find compromise guilty but mentally ill verdicts. *See, e.g., Neely v. Newton*, 149 F.3d 1074, 1080 (10th Cir. 1998); *United States ex rel. Weismiller v. Lane*, 815 F.2d 1106, 1109-13 (7th Cir. 1987).

[5]As a practical matter, even this difference between a guilty and guilty but mentally ill verdict is nonexistent. As the Seventh Circuit recently explained, the available studies of guilty but mentally ill verdicts in states having such verdicts reveals that "the actual disposition of the convicted person is usually the same as under a standard verdict; the defendant will not be released earlier, and will receive no more psychiatric treatment in prison, than a prisoner convicted without any finding of mental illness." *Wilson v. Gaetz*, 608 F.3d 347, 352-53 (7th Cir. 2010) (citations omitted).

> reason for the guilty but mentally ill classification is not rendered a nullity simply because a defendant found guilty and not mentally ill might also receive mental health treatment under M.C.L. § 330.2001 *et seq.*; M.S.A. § 14.800(1001) *et seq.* Further, the guilty but mentally ill verdict "does not absolve a defendant of criminal responsibility; rather, it affords him psychiatric treatment. 'The major purpose in creating the guilty but mentally ill verdict .... was to limit the number of persons who, in the eyes of the Legislature, were improperly being relieved of all criminal responsibility by way of the insanity verdict.' " *People v. Stephan*, 241 Mich.App. at 491, 616 N.W.2d 188 (quoting *People v. Ramsey*, 422 Mich. 500, 512, 375 N.W.2d 297 (1985)) (emphasis in original). There is no indication that the guilty but mentally ill verdict functions to create an element of any offense, including petitioner's offenses . . . . Therefore, petitioner's claim that the trial court reached an incorrect verdict on this question which was not supported by the evidence does not present a federal constitutional question cognizable in habeas corpus.

*Johnigan v. Elo*, 207 F. Supp. 2d 599, 612 (E.D. Mich. 2002) (Steeh, J.). For the same reason, the trial court's failure to instruct on guilty but mentally ill does not present a federal constitutional question cognizable in habeas corpus. And, at a minimum, there is certainly no clearly established federal law as determined by the Supreme Court (or any federal court for that matter), which the Michigan courts unreasonably applied in concluding that the absence of a guilty but mentally ill instruction was harmless. For these reasons, the Court should conclude that petitioner is not entitled to habeas relief on his instructional error claims.

H.     *Competence to Stand Trial (Claim IV)*

Finally, petitioner contends that he was not competent to stand trial, and that he was denied due process in connection with the competency hearing. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.     *Clearly Established Law*

It is well established that "[a] criminal defendant may not be tried unless he is competent." *Godinez v. Moran*, 509 U.S. 389, 396 (1993). "To be competent to stand trial, a defendant must have 'a sufficient present ability to consult with his lawyer with a reasonable degree of rational

34

understanding' and must possess 'a rational as well as factual understanding of the proceedings against him.'" *Jermyn v. Horn*, 266 F.3d 257, 283 (3d Cir. 2001) (quoting 362 U.S. 402, 402 (1960) (per curiam)). "The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings." *Godinez*, 509 U.S. at 401 n.12. "Although no 'fixed or immutable' signs create sufficient doubt about competence, pretrial behavior, demeanor during trial, and previous medical opinions regarding competency are relevant considerations." *Ford v. Bowersox*, 256 F.3d 783, 786 (8th Cir. 2001) (citing *Drope v. Missouri*, 420 U.S. 162, 180 (1975)).

As explained by another Judge of this Court,

> Competency claims can raise issues of both substantive and procedural due process. A petitioner may make a procedural competency claim by alleging that the trial court failed to hold a competency hearing after the defendant's mental competency was put in issue. To prevail on the procedural claim, a petitioner must establish that the state trial judge ignored facts which raised a "bona fide doubt" regarding petitioner's competency to stand trial. *Walker v. Attorney General for the State of Oklahoma*, 167 F.3d 1339, 1343 (10th Cir.1999) (internal citations omitted). A petitioner can make a substantive competency claim by alleging that he was, in fact, tried and convicted while mentally incompetent. A petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence. *Id.* at 1344. To succeed in stating a substantive incompetency claim, a petitioner must present evidence that creates a "real, substantial, and legitimate doubt" as to his or her competency to stand trial. *Walker*, 167 F.3d at 1347.

*Hastings v. Yukins*, 194 F. Supp. 2d 659, 670-71 (E.D. Mich. 2002) (Cleland, J.). A trial court's conclusion regarding a defendant's competence is a factual finding. *See Demosthenes v. Baal*, 495 U.S. 731, 735 (1990); *Maggio v. Fulford*, 462 U.S. 111, 117 (1983). It is therefore presumed correct on habeas review unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

2. *Analysis*

To the extent petitioner challenges the trial court's conclusion that he was competent to stand

35

trial, his claim is without merit.  As noted above, the trial court's conclusion that petitioner was competent to stand trial is a factual finding, and thus habeas relief is appropriate only if the trial court's determination of the facts was unreasonable, *see* 28 U.S.C. § 2254(d)(2), or if petitioner rebuts the factual finding with clear and convincing evidence, *see* 28 U.S.C. § 2254(e)(1).  Here, petitioner has presented no additional evidence regarding his competence that was not presented to the state courts, and thus he has not rebutted the trial court's factual finding that he was competent to stand trial.  Thus, petitioner can obtain relief on this claim only by showing that the trial court's determination was unreasonable in light of the facts presented.  Petitioner is unable to make this showing.

As explained by the court of appeals, both the court appointed expert and the independent expert opined that petitioner was competent to stand trial.  *See Lloyd IV*, 2006 WL 3826737, at *2. In addition, the trial judge relied on his own observations of petitioner at trial, which indicated that petitioner understood the proceedings and was able to assist his defense.  Contrary to petitioner's argument in the state courts, the trial judge was permitted to rely in part on his own observations of petitioner in making the competency determination.  *See Maggio*, 462 U.S. at 117; *Bryson v. Ward*, 187 F.3d 1193, 1201 (10th Cir. 1999); *Hastings*, 194 F. Supp. 2d at 671.  While there was no doubt that petitioner suffered from some psychological problems, not every manifestation of mental illness demonstrates incompetency to stand trial.  Neither low intelligence, mental deficiency, nor the fact that a defendant has been treated with anti-psychotic drugs can automatically be equated with incompetence.  *See Burket v. Angelone*, 208 F.3d 172, 192 (4th Cir. 2000); *Miles v. Dorsey*, 61 F.3d 1459, 1474 (10th Cir. 1995).  As explained above, the only question was whether petitioner was able to understand the proceedings and assist counsel in presenting his defense.  In addition, it was

36

petitioner himself who requested an independent examination for purposes of asserting an insanity defense. The mere fact that petitioner was aware that he could obtain an independent examination casts doubt on his claim that he was mentally incompetent to assist in his defense. *See People v. Daubman*, 546 N. E. 2d 1079, (Ill. Ct. App. 1 989)(defendant's understanding and ability to assist in his defense were reflected in his asking his attorney to seek a second psychiatric examination; thus, it must be concluded that defendant was competent at the time he entered his guilty plea).

In short the two competency evaluations, counsel's testimony at the post-trial evidentiary hearing, and petitioner's own conduct at trial establish that, despite any mental impairments petitioner may have had, he was able to understand the proceedings and assist counsel in presenting his defense. Petitioner has presented no evidence to rebut this finding. Thus, the trial court's conclusion that petitioner was competent to stand trial was reasonable, and petitioner is not entitled to habeas relief on this claim.

Nor can petitioner show that he was denied due process by the trial court's failure to consider certain evidence he wished to admit at the competency hearing. Although the Supreme Court has explained the circumstances in which a competency hearing is required, it has not provided any guidance on the procedures required to be employed in such a hearing as a matter of federal constitutional law. Rather, the Supreme Court has held only that, in certain circumstances, a defendant is entitled to "an adequate hearing on his competence to stand trial." *Pate v. Robinson*, 383 U.S. 375, 387 (1966); *see also*, *Drope v. Missouri*, 420 U.S. 162, 172-73 (1975) (describing *Pate* as requiring an "adequate procedure" for determining competence). The Supreme Court has never "expressly describe[d] the nature of the required evidentiary hearing." *Zang v. Peterson*, No. 89-35646, 1990 WL 173753, at *5 (9th Cir. Nov. 9, 1990). As a matter of statutory law, in federal

37

criminal cases a defendant has the right "to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appear at the hearing," 18 U.S.C. § 4247(d).  Nevertheless, even under § 4247(d) it is well established that "[i]n competency hearings, the limitation or expansion of the scope of testimony . . . lie[s] squarely within the trial judge's discretion."  *United States v. Campbell*, 543 F.2d 1333, 1348 (D.C. Cir. 1974).  The decisions of federal courts considering the matter on habeas review suggest that there are no hard-and-fast rules; rather, the question is simply, as stated in *Pate*, whether the procedures employed were adequate to protect the defendant's right not to be tried while incompetent.  *See Wolfe v. Weisner*, 488 F.3d 234, 239 (4th Cir. 2007); *see also*, *Greenfield v. Gunn*, 556 F.2d 935, 937 (9th Cir. 1977) (internal quotation omitted) (habeas relief not appropriate where petitioner failed to show that the procedures employed by the trial court were "wholly inadequate for a proper determination of . . . competency.").

After applying this standard, in light of the trial court's discretion regarding the admission of evidence, the Court should conclude that the competency hearing conducted by the trial court was adequate to protect petitioner's right not to be tried while incompetent.  As explained above, the trial court considered the items of evidence most relevant to the competence issue: the two reports specifically addressing petitioner's competence to stand trial and petitioner's own conduct during the trial.  While it is true that the trial court did not allow Anna Malawka to testify, her report of petitioner's conduct at an intake assessment was not significantly probative, given that it was made eight months prior to trial and did not directly address petitioner's competence, as opposed to his general mental condition.  Moreover, the report was already part of the record before the trial court and was considered by both competency experts, and petitioner has not suggested any testimony that

38

Malawka would have provided beyond the statements in the report, which was admitted as evidence. *See Lloyd IV*, 2006 WL 3826737, at *2. Similarly, David Baer's belief that petitioner was suffering from delusional thinking did not directly address petitioner's competence to stand trial, and in any event was "already contained in the trial court record and referenced by both experts' reports concerning defendant's competency to stand trial." *Id*. at *3. The testimony of petitioner's mother and cousin might have provided some additional evidence of petitioner's behavior, but similar evidence was already before the court, and they could not have testified as lay witnesses as to petitioner's ability to understand the charges against him and assist in his defense. Testimony from petitioner's appellate attorney regarding petitioner's behavior seven months after trial likewise would have been only marginally relevant to the question of petitioner's competence at the time of trial, and in any event counsel's affidavit was submitted to the trial court by the parties. *See id*. at *4. Finally, petitioner cannot show that he was denied an adequate hearing by the trial court's refusal to allow petitioner to testify. As explained by the court of appeals, "the trial judge had the opportunity to observe [petitioner] during a trial at which he testified and to consider five psychological reports concerning [petitioner] that were based in large part on interviews of [petitioner]." *Id*. Petitioner has failed to offer any indication of what he "could have testified about that might have altered the outcome of the competency hearing." *Id*.

In short, the trial court had before it a wealth of information relating to petitioner's competency, including five psychological reports–two of which were prepared near the time of trial and two of which specifically addressed petitioner's competence to stand trial–and the court's own observations of petitioner's conduct at trial. The bulk of the testimony petitioner sought to present to the trial court was already before the trial court in non-testimonial form, either as exhibits,

39

affidavits, or factors considered by the competency experts. That testimony which was not before the trial court was either only marginally relevant to the issue of petitioner's competence at the time of trial or cumulative of other evidence before the trial court. In these circumstances, the Court should conclude that the procedures employed by the trial court were adequate to protect petitioner's right not to be tried while incompetent, and thus that petitioner was not denied due process by the trial court's exclusion of the testimony he sought to introduce at the hearing.

In view of the foregoing, the Court should conclude that the trial court afforded petitioner an adequate hearing to determine his competence to stand trial, and that the state courts' conclusions that petitioner was competent was a reasonable determination of the facts. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

I.      *Recommendation Regarding Certificate of Appealability*

1.      *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously

40

less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue.  Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84.  Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable."  *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254.  The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue."  FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id*., advisory committee note, 2009 amendments.  In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2.     *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also conclude that petitioner is not entitled to a certificate of appealability, for the reasons explained above.  In light of the deferential review of counsel's actions under *Strickland* and the reasonable explanations provided by counsel for his defense strategy, the resolution of petitioner's ineffective assistance of counsel claims is not reasonably debatable.  Likewise, in light of the fact that petitioner has failed to demonstrate any prejudice by the trial court's failure to grant him more than one week for an independent mental health examination and has failed to provide any evidence that additional time would have allowed him to obtain an expert who could have testified that he was insane, the resolution of petitioner's second claim is not reasonably debatable.  Further, because the instructions given by the trial court on the mental state elements of the crime and on diminished capacity adequately explained the elements and presented petitioner's defense to the jury, and because petitioner cannot show any constitutionally significant prejudice arising from the absence of a guilty but mentally ill instruction, the resolution of petitioner's instructional error claims is not reasonably debatable.  Finally, because the trial court had before it a wealth of information relating to petitioner's competence, and because the trial court's competency determination is well supported by the record, the resolution of petitioner's competency claim is not reasonably debatable.  Accordingly, the Court should deny petitioner a certificate of appealability.

G.     *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.  The Court should also deny petitioner a

42

certificate of appealability.

III.     NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


                                        s/Paul J. Komives
                                        PAUL J. KOMIVES
                                        UNITED STATES MAGISTRATE JUDGE

Dated: 3/10/11

43

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and  by electronic means or U.S. Mail on March 10, 2011.

s/Eddrey Butts
Case Manager